## THOMAS W. HAYTHORN *v.* STEPHEN F. MARGEREM.

In 1814, by agreement under seal, A. contracted to buy, and B. to sell to A. a tract of land ; and B. bound himself to give a deed to A. for it. A: paid the purchase money, and went into possession, and occupied it until 1825, when he moved from the vicinity ; and, subsequently, C. took possession of the land. *Held,* that the fact that A. had not obtained a deed from B. was not a sufficient ground for applying to a Court of Equity to give him possession as against an intruder ; that his remedy was by ejectment.

By agreement under seal B. agreed to sell to A. a tract of land which, the agreement said, B. had bought of C., and for which D., by agreement between him and C., was to make a deed to C. ; and B. undertook to procure and make title to A. D., afterwards, made a deed for the land to E. A. filed a bill against E. alone, praying that his title might be established, and for possession and an account of rents and profits. *Held,* that the representatives of D., who was dead, were necessary parties.

A party in possession may go into a Court of Equity under proper circumstances to remove a cloud from his title. But, it seems, that a party out of possession cannot, as against another in possession and claiming title under a deed, obtain a decree declaring the defendant's title void, and putting the complainant in possession.

On the 26th November, 1814, by an agreement of that date, under seal, between William and Robert Colfax, of the first part, and Thomas W. Haythorn, of the second part, the Colfaxes agreed to sell and convey to Haythorn the middle and south part of the farm they had lately bought of John Seward, situate in Vernon and Hardiston townships, in Sussex county, (describing it,) supposed to contain about 530 acres, including 20 acres near the turnpike house ; for which, the agreement says, Jos. Sharp was to give a deed to said John Seward, by agreement, and which agreement the Colfaxes were, by the agreement between them and Haythorn, to give over to Haythorn ; the Colfaxes to have the farm surveyed as soon as convenient, and to make to Haythorn a good warrantee deed for the same, except a claim that Samuel S. Seward had on the farm, for about $4,000 ; and also for the said 20 acres ; the said claim of Samuel S. Seward to be taken out of the purchase money for the farm. And Haythorn agreed to pay the Colfaxes, on the delivery of the deed, $16 50 per acre, $5,000 down, and the residue in four equal

annual payments, with interest, secured by bond and a mortgage on the premises.

In 1820, Samuel S. Seward obtained a decree of foreclosure on his mortgage, and for a sale of the mortgaged premises, (the claim of Samuel S. Seward, spoken of in the agreement, was a mortgage.) This mortgage did not cover all the lands agreed to be sold by the Colfaxes to Haythorn.

On the 11th of November, 1820, the mortgaged lands were sold by the Sheriff of Sussex under the said decree and a *fi. fa.* issued thereon.

In the September term, 1820, of the Supreme Court, the State Bank at Newark recovered a judgment against Haythorn as indorser for the Colfaxes, for $1,781 53 ; and at the same term recovered a judgment against the Colfaxes for the same debt. On these judgments executions were issued and levied on the lands agreed to be sold by the Colfaxes to Haythorn which were not included in the mortgage to Samuel S. Seward, consisting of three lots : one, called the Butler Seward lot, of about 39 acres ; another, a lot of 20 67–100, lying at the south end of the farm ; and the third, a lot of twenty acres near the turnpike house.

On the 3d of May, 1821, the Sheriff, under the said executions, sold these three lots. Two of them were struck off to Nicholas Ryerson ; and the third was struck off to the Bank.

The Sheriff, by deed dated August 13, 1821, acknowledged August 20, 1822, stating that Nicholas Ryerson, for and in behalf of William Smith, did then and there bid for a certain lot, commonly called the Butler lot, $136 ; and also the said Nicholas Ryerson, for the use of the said William Smith, did then and there bid the sum of $100 for another lot of land, commonly called the turnpike lot, situate on each side of the turnpike, as is supposed, and that no person bid more, conveyed the said lots to William Smith. This deed was made on the sale under the execution of the Bank against Haythorn.

And the Sheriff, by another deed, dated August 13, 1821, acknowledged August 20, 1822, stating that Nicholas Ryerson, for and in behalf of William Smith, did then and there bid for a certain lot of land said to contain 24 acres, commonly known

by the name of the Butler lot, the sum of one dollar, and the said Nicholas Ryerson, for the use of said William Smith, did also then and there bid for another lot said to contain 24 acres, being known by the name of the turnpike lot, the sum of one dollar, and that no person bid more, conveyed the said lots to Wm. Smith. This deed was made on the sale under the execution of the Bank against the Colfaxes.

No deed was ever made by the Sheriff to the Bank for the lot struck off to the Bank at this sale.

After the sale of the mortgaged lands, Haythorn remained in the Mansion House on the farm.

In July, 1825, Haythorn left the county of Sussex, and moved to Paterson, where he has ever since resided.

On the 25th of October, 1842, Haythorn filed his bill, stating the foregoing facts; and stating, that on the execution of the agreement between him and the Colfaxes, for the sale by them and purchase by him of the lands mentioned in that agreement, he paid a large part of the purchase money to the Colfaxes, and, in pursuance of said agreement, entered and took possession of all the lands therein mentioned, and continued in possession, making improvements, and making payments, until about 1819, when he had entirely satisfied the Colfaxes all the money to be paid to them; and that they offered him a deed for the premises; but that, because they had not procured a title from Sharp for the 20 acre lot near the turnpike house, he declined taking the deed till that was done; and that the delivery of the deed from the Colfaxes to him was for this cause delayed from time to time, so that he has never received a title from them. That he made payments from time to time on the mortgage to Samuel S. Seward, until 1819, when S. S. Seward filed his foreclosure bill.

He says that, after the Sheriff's sale of the mortgaged land to Ryerson, and on the 28th of November, 1820, Ryerson, at the request of the complainant, Haythorn, and by an arrangement and agreement between the complainant and Smith, for $300, assigned all his right and interest in his bid for the mortgaged premises to Smith, and thereby directed the Sheriff to convey said mortgaged lands to Smith; and that the Sheriff, in

pursuance thereof, on the 29th of November, 1820, by deed of that date, conveyed the said mortgaged lands to Smith.

That it was agreed between the complainant and Smith, that the complainant might become joint owner of the lands so conveyed to Smith by paying half the purchase money ; and that they would carry on business on the said lands together. That, in pursuance thereof, the complainant and Smith built and put in operation together, on said mortgaged premises, a forge and saw mill. That Smith resided in New York. That the complainant had the possession of the said premises, and controlled and managed the business thereon. That he remained so in possession of said premises until July, 1825, when, he and Smith having had difficulties respecting said agreement to purchase the said lands sold under the mortgage, and respecting the business carried on by them on the same, and having submitted those difficulties to arbitration, the complainant gave up the possession of said mortgaged lands to Smith, and moved to Paterson.

As to the lots not included in the mortgage, he states, that he remained in the quiet and peaceable possession of them from the time he purchased them, with the mortgaged property, from the Colfaxes, until he moved to Paterson.

He states, that at the sale of these lots under the judgment of the Bank against him, Mr. Vanderpool and Mr. Bolles attended the sales as agents of the Bank, and that Nicholas Ryerson attended there as his agent and friend. That Ryerson remonstrated against the sale of the complainant's lands, insisting it was wrong to sell the complainant's lands while the Colfaxes had lands and means of paying the claim. That it was then agreed between the agents of the Bank and the complainant that the Sheriff should sell the complainant's said tracts of lands, by virtue of said judgment and execution against him, upon the condition and the express understanding that the Sheriff should delay to make a deed, and that if the claim of the Bank was paid and satisfied in a short time, by the Colfaxes or the complainant, the sale was to be void and of no effect. That the Sheriff then, in pursuance of the said understanding and agreement, put up the said lots for sale by virtue of the execution against the complainant, and that said N. Ryerson, at the in-

stance and as the friend and agent of the complainant, bid in two of said lots, the Butler Seward lot, and the lot at the south end of the farm. (The deed from the Sheriff to Smith, above stated, for two lots conveys the Butler lot and the turnpike lot.)

That at the same time, and under the same arrangement and understanding, by virtue of the execution of the Bank against the Colfaxes, the Sheriff sold the right and interest of the Colfaxes, if any, in the said two lots, to the said Ryerson, for the nominal sum of $1 for each lot.

That on the sale under the execution against the complainant the said Vanderpool bid off the other lot.

That afterwards, in June then next, the Colfaxes and the complainant paid the entire claim of the Bank; it being paid mostly by the surplus money arising from the sale of said mortgaged premises, the amount of that sale being more than the mortgage debt.

That neither Ryerson or Vanderpool ever paid anything on account of the lots so bid off by them, respectively, or obtained any deed, or directed any deed to be made to any other person.

That Smith, learning that the complainant's said lots had been sold by the Sheriff, applied to and procured from the Sheriff, without the knowledge or consent of Ryerson or the complainant, deeds for the said two lots so bid off by Ryerson. That Smith represented to the Sheriff, as the complainant is informed and believes, that Ryerson bid off the said lots for him, Smith, and as his agent; and that Ryersson was willing, and had directed him to obtain deeds for the said lots; and that the Sheriff, not knowing that the claim of the Bank was satisfied, was induced to and did receive the amount of the bids from Smith, and deliver to him deeds for the said two lots, upon the condition and understanding, as the complainant was informed, that the Sheriff would hold the money therefor, and if the delivery of the deeds to Smith should prove to be wrong, they should be returned and the money refunded; and that the money remained in the hands of the Sheriff until and at the time of his death, in about 1830.

The bill then states the death of Smith, in 1826; and the sale of his real estate by commissioners, on the 3d of April, 1827;

and that the defendant Margerem became the purchaser, and received from the commissioners a deed which included the said two lots of the complainant.

That Margerem, in 1827, besides taking possession of the lands which belonged to Smith, in his lifetime, also entered upon and took possession, unlawfully, of the complainant's said three tracts before mentioned.

That, as soon as the complainant was informed of such entry and intrusion, he went to Margerem and remonstrated with him; that Margerem said he would make inquiry, and that if said lots belonged to the complainant he would buy them of the complainant; and that he, Margerem, would investigate the matter; that the matter was delayed from time to time, at the request of Margerem, until about three years had elapsed, when the complainant insisted on knowing what he intended to do, and Margerem then stated that he thought the complainant had no right to the said lots, and refused to give them up to the complainant.

That, as soon after as he could command funds to do so, he employed Thos. C. Ryerson, since deceased, as his counsel to aid him in the recovery of the said lots. That said T. C. Ryerson was shortly after appointed a Justice of the Supreme Court; that he then employed other counsel, and was about to commence a suit for the recovery of his said lots, when Margerem expressed his willingness to submit the matter to arbitration, and wished the complainant to defer suit until he, Margerem, could confer with his counsel in respect to submitting the matter to arbitration; and the complainant did so. That Margerem, after thus prolonging the matter, finally refused to submit it to arbitrators. That Margerem has been in possession of all said lots from 1827 to this time.

The bill prays that Margerem may be decreed to deliver possession to the complainant, and to account for the rents and profits; and that the deed from the Sheriff to Smith for the said two lots bid off by Ryerson may be declared void; and that the complainant's right and title to the said lots may be established; and for such further and other relief &c.

The defendant, in his answer, admits, that the complainant,

21

for some time previous to, 1820, was in possession of a farm and tract of land situate in Vernon and Hardiston, as set forth in the bill; but of how much land, or by what title, agreement or authority, he does not know; nor has he any knowledge of any such article of agreement between the Colfaxes and the complainant; nor of the existence of any articles of agreement between Joseph Sharp and John Seward for the sale and conveyance of the said 20 acre turnpike house lot.

He says he is informed and believes that the Sheriff, by virtue of a decree and execution in the foreclosure suit of Samuel S. Seward, sold the mortgaged premises, on the 11th November, 1820; and that Nicholas Ryerson then bid for and became the purchaser of the same, for $5,610. And he is informed and believes that Ryerson, in so bidding and becoming the purchaser of the mortgaged premises, was not acting as the agent or on account and behalf of the complainant, but for the benefit and on behalf of himself and said Wm. Smith.

He admits that Ryerson, on the 28th of November, 1820, assigned to said Smith all the right and interest he had acquired in said mortgaged premises by his said bid and purchase, for $300, and that the Sheriff, by deed dated November 29, 1820, conveyed the said mortgaged premises to Smith.

He says he has no knowledge or belief that the complainant was to become a joint owner with Smith in the purchase of said mortgaged premises; but says he is informed and believes that, about the time or soon after the said mortgaged premises were conveyed to Smith, Smith took possession thereof, except the principal dwelling house and three lots of land adjacent thereto, containing together about 50 acres, which, by his permission, the complainant retained and occupied as tenant to Smith, until Smith, on the 22d of February, 1825, recovered a judgment in ejectment against the complainant; and afterwards, on or about July 13, 1825, the Sheriff dispossessed the complainant, and delivered the possession of the said three lots to Smith.

He says he is informed and believes that Smith, when he purchased said mortgaged premises and afterwards, lived in New York; but that his servants, agents and tenants occupied the

said mortgage premises, except the said three lots retained by the complainant.

He speaks of the reference in the suit of Haythorn *v.* Smith's administrator; and says that all matters in difference between Haythorn and Smith were referred; and that no claim to any interest in the mortgaged premises was set up by the complainant.

He admits that the Butler Seward lot, of about 29 acres, and not 39 as stated in the bill, and the lot of 25 8–100 acres on the south end of the farm, and the 20 acre lot near the turnpike house, were not included in the mortgage to S. S. Seward, and were not conveyed by virtue of said decree and execution to Smith.

He admits that the complainant left the premises and moved to Paterson about July 12, 1825.

He admits the sale by the Sheriff under the judgments and executions of the Bank against the complainant and the Colfaxes, respectively, of all the right, title and interest of the complainant and of the Colfaxes in the said Butler Seward lot and the said lot at the south end of the farm, containing, after deducting 4 41–100 acres, sold by the complainant to George Kanouse, 20 67–100 acres ; and that at that sale N. Ryerson bid for and became the purchaser of the said two lots ; but he denies that N. Ryerson bid for and purchased the same for or on behalf of the complainant; but says he is informed and believes, and therefore states, that said Ryerson was then acting as the agent and on behalf of said Smith.

He says he has no personal knowledge that there was any agreement or understanding that the said sale was upon any condition respecting the payment of the money due the Bank, and never heard of any such condition until the complainant mentioned the same to him, as in the answer afterwards stated.

He then states that the Sheriff delivered to Smith deeds of all the complainant's right, title and interest, and of all the Colfaxes' right, title and interest in the said two lots ; and that the Sheriff, in both said deeds, has recited that said N. Ryerson bid for and purchased the said property for and on behalf of and to the use of said Smith.

He admits that Smith died in 1826 ; and that, on the 3d of April, 1827, the commissioners appointed to divide his real estate offered for sale the said Seward farm, together with several tracts adjoining the same, whereof Smith had died seized and possessed, a map whereof was then and there exhibited, showing the metes and bounds of all the said tracts or parcels of land so by them offered for sale.

He says that, relying on the information derived from the inspection of said map and from several of Smith's heirs who were familiar with his lands and knew what he had possessed in his lifetime, and also on the information of the said commissioners, he was induced to and did bid for and become the purchaser of said farm and tract of land, for $5,100, by him afterwards paid to the commissioners ; and the commissioners, by their deed dated August 1, 1827, conveyed to him the said lands and premises ; and therein and thereby, among other tracts of land, conveyed the said Butler Seward lot, and the said lot of 25 8–100 acres, including the 4 41–100 acres sold by Haythorn to Kanouse thereout, and which 4 41–100 acres Kanouse afterwards sold to Smith.

That, soon after the said commissioners' sale to him, to wit, on or about the first part of May, 1827, as he was then informed and has since been informed and believes, took possession of all the lands described in said map and the said commissioners' deed, and which said Smith had occupied in his lifetime and up to the time of his death ; and says he has ever since been in the quiet and peaceable possession of said lands and premises.

That the 20 acre lot near the turnpike house was never, as he is informed and believes, in the possession of Smith ; and this defendant never had or took possession of it until or about April 29, 1842, when Joseph Sharp sold and conveyed it to him for $145.

That the complainant, in all the claims made against him, and in all the various conversations on the subject of those lands, as in the answer afterwards stated, never mentioned to him any claim or demand against him for the said turnpike house lot ; and that the first information he had of any such claim was from the bill ; and that he is informed and believes that Sharp was and is

under no obligation whatever, in law or in equity, to convey said
lot to the complainant.

He admits that the complainant spoke to him and made claim
to the other lots, that is to say, the Butler Seward lot and the lot
at the south end of the farm; but never, to his knowledge, re-
collection or belief, till some time in 1837.

He says he was greatly surprised at the said claim, and there-
upon told the complainant that he supposed he had a good title
to all the lands he possessed : that he had bought upon the rep-
resentations of the heirs of Smith and of the said commission-
ers; but had never examined the titles, nor had them examined
expressly for himself; but that he would do so; and if he found
that the complainant had any right to any part of said lands, he
would cheerfully give it up to him or pay him the value of it.

That he is informed and believes that his counsel examined his
titles to the said three lots; and when he, the defendant, next
saw the complainant he told the complainant he had not been able
to discover that the complainant had any title to the said lots or
either of them.   That the complainant then stated to him that
the said deeds from the Sheriff to Smith for two of the lots were
fraudulent and void for the reason stated in the bill.   That he,
the defendant, then said he would also examine into that; and,
of course, he had to take time for that purpose.   That he there-
upon did inquire and examine into the same; and could get no
information that induced him to believe the said deeds fraudu-
lent.   And as soon as he could, with all reasonable diligence,
satisfy himself on the subject, he told the complainant of the
result of his inquiry, and that he was not willing to give up the
said lands.   And he says he has made no unnecessary delay in
the matter.

He denies that he has ever expressed any willingness to
submit the said matters to arbitrators; but he always declined
such submission, stating that he had bought the property for a
full and valuable consideration without the knowledge or suspi-
cion of any defect of title to any part of it.   But he admits
that, on one occasion, on his being urged by the complainant to
submit the matters to arbitrators, he told complainant he would
leave it to his counsel to direct him what to do.   And upon being

advised not to do it, he took the earliest opportunity of inform-ing the complainant of the advice he had received.

He denies that the complainant ever offered to sell him the said lands, or to come under any agreement respecting the same; but, on the contrary, he says that, being willing to quiet all claims to his land and to buy his peace at a reasonable price, he has frequently asked the complainant what value he set upon his said claims, and how much he would take for the said lands whether he had any right to them or not; but the complainant never would make him any direct answer to such inquiries.

He says he is informed and believes that, while the complain-ant was in possession of the 50 acres as tenant to Smith, and when Smith was desirous of getting possession thereof, he, Smith, offered the complainant to convey to him 200 acres in Oswego county, New York, and a yoke of oxen and a wagon, if he would qiut all the said premises and give up the possession of and all claims to the same to Smith; but that the complainant hesi-tated about accepting said proposition, and delayed giving an an-swer until Smith brought his said ejectment.

He says he is informed and believes, that the said ejectment was set down for trial in November term, 1824, and that the complainant relinquished his plea, and judgment was entered aginst him at the February term, 1825, of the Supreme Court. That, after the complainant had relinquished his plea, Smith, through the importunity of Mr. Frelinghuysen, Haythorn's counsel in that suit, and as a mere gratuity to the said Haythorn, and in consideration of his misfortunes, entered into an agree-ment with him as follows: " I, William Smith, of New York, for and in consideration of one dollar, and other good considera-tions to me paid by Thomas W. Haythorn, of Sussex, do cove-nant, grant and agree to and with the said Thomas, to grant, bar-gain and convey to him in fee simple, by good and sufficient deed, 200 acres of land to be selected by said Thomas from and out of a tract of land owned by said William Smith in the Scriba patent (&c.), excepting from the said right of selection lots 68 and 74, the said 200 acres to be selected in a body; and the said William agrees to execute said deed as soon as the said Thomas shall notify him of the selection.   And the said William further

agrees to deliver a yoke of oxen, a yoke and chain and a two-horse wagon, in thirty days from date, to the said Thomas.

Nov. 28, 1824.                                         WM. SMITH."

Witness, JOB S. HALSTED.

And delivered the said agreement to the said complainant.

He says he is informed and believes that, about the time of the making of said agreement, and afterwards, the complainant declared to divers persons that Smith was a friend to him, and, notwithstanding all their differences, had agreed to provide well for him by giving him a good farm in the State of New York; that he had given up all the property here, and was going to the land Smith had given him.

He says he is informed and believes, that the complainant, after Smith's death, brought his action against Smith's administrator, to the term of August, 1828, of the C. P. of Sussex; and that the matters in controversy in said suit, and all other matters in dispute between the said parties, were by rule of said Court, made at May term, 1830, referred to referees; who made their report at the term of August, 1830, and thereby reported that they found due the complainant $127 84 damages besides costs, and that judgment was entered for the complainant for the said sum. And he says he is informed and believes, that the complainant, among other things, upon the said reference demanded $1,500 for damages he alleged he had sustained by reason of Smith's not having conveyed to him the said lands in Oswego county, New York; but that the said claim was not allowed, as Haythorn had never made any selection of land. But this defendant is informed and believes, that said land was afterwards conveyed to Haythorn by or on behalf of the heirs of said Smith.

He says he is informed and believes that, during the progress of said suit and reference, Haythorn made no claim to the said tracts now claimed by him of this defendant, or either of them, nor to any damage or charge for the use or occupancy thereof by Smith or his hands.

And the defendant submits, whether any claim which the complainant may possibly have to the said tracts of land now claimed by him is now barred by the statute of limitations, inas-

much as he, the defendant, and those under whom he claims have been in the peaceable and quiet possession of the same for more than 20 years next before the commencement of this suit. And he prays the benefit of the statute as fully as if he had pleaded it.

Testimony was taken on both sides ; and the cause was heard on the pleadings and proofs.

*R. Hamilton* and *F. T. Frelinghuysen* for the complainant. They cited 2 *Story's Eq.*, sec. 769, 770, 1 ; 1 *Ib.*, sec. 175 ; 2 *John. Ch.* 585.

*D. Haines* and *P. D. Vroom* for defendant. They cited 7 *Halst. Rep.* 336 ; 2 *Green's Rep.* 567 ; 8 *Wheat.* 326, 336, 7 ; 8 *John. Rep.* 137 ; 3 *John. Ch.* 147, 377 ; 8 *Cranch*, 462 ; *Den.* v. *Hunt*, 1 *Spencer's Rep.* ; 2 *Sugd. on Vendors*, 427.

THE CHANCELLOR. The agreement of sale and purchase between the Colfaxes and Haythorn included three lots which were not covered by the mortgage to Samuel S. Seward, namely, the Butler Seward lot, the lot at the south end of the farm, and the turnpike house lot.

Haythorn went into possession of these, as well as of the part mortgaged to Samuel S. Seward, in 1814, under the said agreement of sale and purchase between the Colfaxes and him.

In November, 1820, the lands mortgaged to Samuel S. Seward were sold, under a decree and execution for the sale thereof, to satisfy Seward's mortgage ; and the title to these mortgaged premises became snbsequently vested in Smith.

In May, 1821, the said three lots not included in the mortgage were exposed to sale by the Sheriff, on judgments and executions in favor of the State Bank at Newark against Haythorn and the Colfaxes ; and two of them, viz., the Butler Seward lot and the turnpike lot, were struck off to Nicholas Ryerson ; and the third was struck off to the Bank. No deed was ever made to the Bank for the lot struck off to them ; nor was any deed ever made to Ryerson for the lots struck off to him.

The debt due the Bank, and for the payment of which these three lots were so exposed to sale and struck off, was afterwards paid by Haythorn and the Colfaxes; the judgments were obtained on notes of the Colfaxes on which Haythorn was indorser. Nothing was ever paid by Ryerson or the Bank for or on account of the lots so struck off to them, respectively.

In August, 1821, Smith obtained from the Sheriff deeds for the two lots so struck off to Ryerson, and paid to the Sheriff the sums for which the said two lots were, respectively, struck off. That money remained in the hands of the Sheriff until and at the time of his death; and is still in the hands of his representatives.

Afterwards, the commissioners appointed to divide the estate of Smith after his death sold all his real estate to Margerem, the defendant, at public sale; and included in said sale the Butler Seward lot and the turnpike lot, for which Smith had so obtained deeds from the Sheriff.

As to the lot at the south end of the farm, then, the case is simply this : Haythorn went into possession of it under a written agreement under seal for the purchase of it from the Colfaxes, and paid the purchase money, and remained in actual possession of it until he removed to Paterson, in 1825 ; and neither Smith nor Margerem ever acquired any title or pretense of title to it. Neither Smith nor Margerem has ever had anything to oppose to Haythorn's right to the possession of this lot, except a possession, if they had possession, without any title or right of possession. Haythorn's prior possession was at all times sufficient for his recovery of the possession of it from them or either of them by ejectment. And he had not only the prior possession, but that was accompanied with the right of possession, under the said agreement between the Colfaxes and him. I do not see that the fact that Haythorn had not obtained a deed from the Colfaxes of the legal title and that in that view his title was only an equitable title is any reason why this Court should be applied to to give him possession as against an intruder upon his possession. It would have been proper for him to come here to obtain the legal title from the Colfaxes ; but that is not the object of this bill ; the Colfaxes are not parties to the bill. The

prayer of the bill is for possession as against Margerem. His remedy was by ejectment.

As to the turnpike lot, the defendant says he is informed and believes it was never in the possession of Smith; and that he, the defendant, never held or took possession of it until April, 1842, when Jos. Sharp sold and conveyed it to him. If, then, Haythorn is entitled to the possession of this lot as against the defendant, he has a plain remedy by ejectment.

If, by reason of the state of things between Jos. Sharp and John Seward, (whose interest in or claim to a title for said turnpike lot, from Sharp, is said to have passed from said John Seward to the Colfaxes, and from the Colfaxes to Haythorn,) Sharp was under no obligation to make a title for said lot to John Seward, or to any one claiming his interest, but was at liberty to convey it to whom he pleased, then his grantee cannot be disturbed in the possession of it. As to this lot the remedy of Haythorn is either by ejectment against Margerem, if, under the circumstances, that shall be deemed the proper remedy, or by bill against Sharp for a conveyance or compensation, making all necessary parties defendants. I do not see how this Court can take any action in reference to this lot on a bill against Margerem alone. The question between Sharp and John Seward, or the assignees of his interest, cannot be settled on a bill to which Sharp's representatives are not parties.

There seems to have been a misapprehension on the part of the complainant as to the two lots struck off to Ryerson on the sale under the Bank judgment and execution. The bill states that at that sale the Butler Seward lot and the lot at the south end of the farm were struck off to Ryerson; and the answer admits this; but the Sheriff's deeds to Smith for the two lots struck off to Ryerson at that sale show that they were the Butler Seward lot and the turnpike lot, and not the lot at the south end of the farm; and Margerem, at the commissioners' sale of Smith's lands, bought the lots which had been so deeded by the Sheriff to Smith. But the defendant, in his answer, says he is informed and believes that Smith never had possession of this lot, and that he, the defendant, never took possession of it until 1842, when he took possession of it under a deed from Sharp to him; and

this is the title under which the defendant claims to hold this lot. Now, Sharp may or may not have been bound to convey this lot to John Seward, or the assignees of his interest in it. It is clear that the Court cannot on this bill, to which Sharp's representatives are not parties, give Haythorn any relief as to this lot.

As to the Butler Seward lot, the case seems to be this : It was not included in the mortgage to Samuel S. Seward. In May, 1821, it was struck off to Ryerson at the Sheriff's sale under the Bank execution. On the 20th of August, 1821, the Sheriff made a deed for it to Smith. On the 23d of November, 1824, Smith recovered a verdict in ejectment against Haythorn for that part of the premises mortgaged to Samuel S. Seward of which Haythorn then remained in possession. On that day Smith gave to Haythorn a writing by which, in consideration of $1 and other good considerations, he covenanted, granted and agreed with Haythorn to convey to him in fee 200 acres of land in the Scriba patent, Oswego county, New York, to be selected in a body by the said Haythorn, and to execute the deed as soon as the said Haythorn should notify him of the selection ; and Smith, by the said writing, further agreed to deliver to Haythorn a yoke of oxen, ox yoke and chain, and a two-horse wagon, in 30 days from the date of said writing. These latter articles appear to have been delivered to Haythorn shortly after. Judgment in the ejectment was entered at the term of the Supreme Court succeeding the verdict; and in July, 1825, Haythorn was dispossessed of the premises for which the ejectment was brought; and thereupon moved to Paterson. This Butler Seward lot, though not included in the mortgage to Samuel S. Seward, lay within the enclosures of the farm.

In 1826, William Smith died. Commissioners were appointed to make partition of his lands ; and on a report that the lands could not be divided without prejudice, the commissioners were ordered to sell them at public sale. The defendant, Margerem, was the purchaser at this sale. This Butler Seward lot was included in this sale ; and the commissioners executed to Margerem a deed for the land so sold by them, including the Butler Seward lot, on the 1st of August, 1827 ; and Margerem, thereupon, went into possession.

Previous to May, 1830, Haythorn sued the administrators of
William Smith, in the Common Pleas of Sussex, in an action on
the case, for work and labor, &c.   In the term of May, 1830, of
that Court, it was ordered by the Court, with the consent of the
parties, that all matters in dispute and difference between the
parties be referred to the award, order, arbitrament, final end and
determination of Jos. E. Edsall, Robert A. Lum and David
Ford.   On the 16th of August, 1830, the referees reported that
they found due to Haythorn, from the administrator of Smith
$129 84, with costs; and further reported, that as respects a
certain article of agreement for the conveyance of 200 acres of
land by Wm. Smith to Haythorn, made Nov. 23, 1824, they
took the matter contained in the said articles into consideration,
and were not influenced in making out their report by anything
contained in that article ; and that they could not allow to Hay-
thorn his claim for damages for the neglect of said Smith to exe-
cute the conveyance for the said land ; Haythorn having failed or
neglected to make his selection and notify Smith thereof.

On the 5th of May 1835, Thomas C. Ryerson, as late Attor-
ney of Thomas W. Haythorn, in a controversy between him and
the Administrators of Smith, deceased, gave a writing by which
he acknowledged to have received from Elias L'Hommedieu, in
behalf of the said Administrators of Smith, a deed for 161 1-4
acres of land in Oswego county, New York, executed to said
Haythorn, and also $47 41 in money ; which deed, he in pur-
suance of instructions from the said Haythorn, accepted for him
in full satisfaction and fulfillment of a written promise made by
said Smith in his lifetime to the said Haythorn, for the convey-
ance of two hundred acres of land in the State of New York.

Matters stood in this situation until the filing of the bill in
this cause, on the 25th of October 1842 ; the defendant, Marge-
rem, having been in possession of the Butler Seward lot, under
his deed from the said commissioners since August 1827, a pe-
riod of 15 years, and Smith in his lifetime having been in pos-
session of this Butler Seward lot from July 1825, when Haythorn
removed to Paterson till his death, claiming title thereto under
his deed from the Sheriff in Aug. 1821 ; and as to the possession

of this lot between Aug. 1821 and July 1825, the evidence of an exclusive possession by Haythorn is not very satisfactory.

Here, then, is a period of at least 17 years, during which Margerem, and Smith, under whom he claims, have been in exclusive possession of this lot prior to the filing of the bill, claiming title under deeds. This would not be conclusive against Haythorn's report either at law or in this Court; but it shews a staleness in the present claim, which added to the facts before stated, should admonish the Court not to venture on any doubtful ground or ahead of jurisdiction, or any exercise of a jurisdiction properly belonging to a Court of law, for the purpose of giving the Complainant relief in this Court.

The ground on which the Complainant comes here seems to be that his title is only an equitable title, he never having obtained a deed from the Colfaxes, and that the deed from the Sheriff to Smith for this lot, struck off to Ryerson at the Sheriff's sale on the Bank execution, was improperly obtained by Smith from the Sheriff, and was illegally given by the Sheriff to Smith; that it was agreed, at and before this sale, between the persons there representing the bank and Haythorn and the Sheriff, that the deed should not be delivered, but that time should be given, notwithstanding the striking off the lots at the sale, for the payment of the bank judgment; and that if it was paid within some short time no deed should be executed by the Sheriff; that the bank judgment was paid before the Sheriff made the deed to Smith; and therefore the Sheriff had no right or authority to make a deed, even to Ryerson, the person to whom this lot was struck off; much less to Smith; and that the deed was procured by Smith from the Sheriff by misrepresentations made by him to the Sheriff, and was therefore fraudulent and void.

And the complainant comes into this court praying that Margerem, to whom this lot, with other lands, was conveyed by the commissioners who sold Smith's real estate, may be decreed to deliver possession of this lot to the complainant; and to account for the rents and profits of it; and that the deed from the Sheriff to Smith therefor may be declared void, and that the complainant's right to the said lot may be established.

If the complainant was in possession, it may be that a bill

would be entertained in this court for the purpose of setting aside a deed obtained under such circumstances as those under which Smith obtained a deed from the Sheriff for this lot. A party in possession may come into this court under proper circumstances to remove a cloud from his title. But I am not aware that a party out of possession can come here as against another in possession, and claiming title under a deed, and obtain a decree declaring the defendant's deed void and putting the complainant in possession and giving him an account of the rents and profits. If the deed from the Sheriff to Smith was void, it was void at law as well as in equity ; and the complainant's prior possession and right of possession under the agreement between the Colfaxes and him was sufficient for him to maintain ejectment against Smith. And, in ejectment against Margerem, the questions, whether the case was within the principle that a *bona fide* purchaser from a fraudulent grantee will hold unaffected by the fraud, and whether Margerem was such a *bona fide* purchaser, were questions as proper for a court of law as for this court.

This court could not grant the relief sought by this bill without declaring that the title set up by Margerem is bad, and that the complainant is entitled to the possession of the lands against that title. This, I conceive, would be going beyond the province of this court.

Smith had a deed for this lot from the Sheriff, and came into possession of it at least as early as July, 1825, when Haythorn moved to Paterson ; and he died in possession, in 1826. Margerem bought it at the commissioners' sale of Smith's estate ; and has been in possession ever since. If there were any equities in the case proper to be settled by this court, after a trial at law, this court might retain the bill until the question of title should be settled at law. But an ejectment, with the action for mesne profits, if judgment should be recovered in the ejectment, would afford full relief. There would be nothing left for the action of this court. If the time which has elapsed would now be a difficulty in the way of the complainant, at law, that difficulty cannot affect the determination of this court as to the propriety of its granting the relief sought by this bill.

Bill dismissed.